# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## KANSAS CITY-WESTERN DIVISION

AGI SURETRACK, LLC,

     Plaintiff,

v.                                                    Case No.: _____

DANIEL ECKART, BRIAN FOLKERS;
LAURA HANDKE, BONNIE
SALISBURY, ROBIN WALTERS, and
AGGREGATE, LLC,

     Defendants.

_____

## COMPLAINT

     Plaintiff AGI SureTrack, LLC ("AGI SureTrack"), for its cause of action against Daniel Eckart ("Eckart"), Brian Folkers ("Folkers"), Laura Handke ("Handke"), Bonnie Salisbury ("Salisbury"), Robin Walters ("Walters"), and Aggregate LLC ("Aggregate"), alleges and states as follows:

## INTRODUCTION

     1.     AGI SureTrack is an agricultural technology company founded in the early 2000s in Archie, Missouri, formerly known as IntelliFarms.

     2.     Among other things, IntelliFarms developed, manufactured, and sold, and continues to do so as AGI SureTrack, a now cloud-based internet of things device and related software under the BinManager brand. The sophisticated and proprietary BinManager system consists of temperature, moisture, and other sensors placed on cables in grain bins. These sensors transmit information that is processed on the device and sent to the cloud for display on a user interface. This information allows farmers (sometimes also called growers) to better control the

temperature and moisture of harvested and stored commodities, typically row crops, such as corn and soybeans.

3.    Farmers using BinManager can reduce spoilage and obtain the best price for their product in agricultural commodity markets. The system also automatically controls drying fans in the bins, which allows for greater operating efficiency and reduces energy use, thus benefitting the environment.

4.    AGI SureTrack and its predecessor invested substantial time and money in both the development and improvement of BinManager, as well as sales and marketing. This investment resulted in the creation of a high-demand, best-in-class product.

5.    Defendant Walters formerly was head of marketing for AGI SureTrack. Eckart, Folkers and Salisbury were employees reporting to Walters in the marketing department, and Handke was an independent contractor who worked with marketing as well (collectively, the "Marketing Team").

6.    The Marketing Team worked on a variety of projects related to sales and marketing, including dealer recruitment, training and enablement, product development and training, and sales lead generation. As such, the Marketing Team was privy to related AGI SureTrack's confidential and/or trade secret information. As a result, certain defendant members of the Marketing Team were required to execute non-competition agreements. All were subject to internal rules concerning the handling of confidential information.

7.    The Marketing Department played a key role in helping AGI SureTrack to compete with other companies in the industry for market share.

133936626.1

8.    Aggregate is a marketing agency specializing in the agriculture industry. Upon information and belief, all of the individual defendants are employees of, and/or partners in or members of Aggregate.

9.    One of AGI SureTrack's primary competitors is OPI Grain Systems ("OPI"), a Canadian company doing business in the United States. Recently, OPI hired a number of former AGI SureTrack employees. [1]

10.    Notably, OPI also recently announced that Aggregate is now its marketing agency of record.

11.    Thus, this case concerns the defendants' flagrant breach, as former AGI SureTrack employees, of their non-competitions obligations under agreements, and breach of confidentiality obligations under those same agreements and/or company policies, including those found in the employee handbook and elsewhere.

12.    AGI SureTrack now brings this action in order to enforce these employees' agreements with the company and to prevent them from using confidential and trade secret information to further their new company's interests, all to the detriment of AGI SureTrack. AGI

---

[1] Additional former AGI SureTrack sales employees have recently accepted sales-related positions with one of Aggregate's clients, IntelliFarms Northern Division ("IFND" or "IntelliFarms North"), a former AGI SureTrack distributor who also is now competing with AGI SureTrack by selling OPI grain bin monitoring products. AGI SureTrack recently filed a lawsuit against IFND that presently is pending in this Court, styled *AGI SureTrack, LLC v. IntelliFarms Northern Division, Inc.*, Case No. 4:23-cv-00578-RK, in order to prevent IFND from continuing certain bad acts that are damaging AGI SureTrack, including diverting customers using AGI SureTrack's confidential information, among other things. AGI SureTrack also has sued several former sales and software development employees in this Court for separate non-compete violations and trade secret theft, among other things. *See AGI SureTrack v. Andricks, et al.*, Case No. 4:23-cv-00605-RK. Finally, a related case has been filed in the District of Kansas against two other former employees for non-compete violations and trade secret theft, among other things. *AGI SureTrack v. Tackett, et al.*, Case No. 2:23-cv-02372-HLT-GEB.

3

SureTrack further seeks money damages to compensate for the harm already wrought by defendants' flagrant breaches and, in some instances, tortious conduct.

## THE PARTIES

13.    AGI SureTrack is a Missouri limited liability company with its current principal place of business located in Lenexa, Kansas. Its sole member owner is Westfield Distributing (North Dakota), Inc., a North Dakota corporation with its principal place of business in North Dakota. Both companies ultimately are subsidiaries of Ag Growth International, Inc. ("Ag Growth International"), a Canadian publicly traded company headquartered in Winnipeg, Canada. Ag Growth International owns a variety of companies around the world, which are collectively referred to as AGI.

14.    AGI SureTrack also does business under the d/b/a AGI Digital.

15.    Ag Growth International, through Westfield, acquired all of the member interests in IntelliFarms in March 2019.

16.    In April 2021, AGI, again through Westfield, also acquired all of Farmobile, Inc.'s stock. Farmobile operated through a limited liability company, Farmobile LLC. Farmobile Inc. was the sole member of Farmobile LLC.

17.    Farmobile was merged into AGI SureTrack in January 2023.

18.    Folkers is a resident of Missouri, with a home address of 106 Lakeland Drive, Smithville, MO 64089. Folkers was employed at AGI SureTrack as a marketing professional from September 3, 2019, to April 21, 2022.

19.    Eckart is a resident of Missouri, with a home address of 13029 Corrington Avenue, Grandview, MO 64030. Eckart was employed at AGI Suretrack as a marketing professional from October 30, 2017 to August 11, 2022.

4

20.     Handke is resident of Kansas, residing at 31402 255th Street, Easton, KS 66020. Handke was an independent contractor in marketing for AGI SureTrack beginning July 29, 2019. Her contract never terminated.

21.     Salisbury is a resident of Missouri, with a home address of 303 S. Texas Street, Archie, MO 64725. Salisbury was employed at AGI SureTrack as a marketing professional from July 15, 2019 to April 21, 2022.

22.     Walters is a resident of Missouri, with a home address of 803 Old Paint Road, Raymore, MO 64083.  Walters was employed at AGI Suretrack as Marketing Director from June 28, 2019, to April 21, 2022.

23.     Defendant Aggregate LLC, is a Missouri LLC, with its principle place of business in Raymore, Missouri. Upon information and belief, Aggregate's members are individuals domiciled in Missouri.

<u>JURISDICTION AND VENUE</u>

24.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 as complete diversity exists between AGI SureTrack and the defendants, and the amount in controversy exceeds $75,000, exclusive of attorneys' fees, costs, and interest.

25.     In addition, this Court has federal-question jurisdiction pursuant to 28 U.S.C. § 1331 as the Complaint asserts causes of action arising under federal law, namely the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, 1839.

26.     The Court also has supplemental jurisdiction over the state law claims herein because they arise from the same nucleus of operative fact. 28 U.S.C. § 1367.

27.     Personal jurisdiction exists over Eckart because he is domiciled in Missouri and bound by the Jurisdiction and Venue provision of his Confidentiality, Noncompetition and

133936626.1

Nonsolicitation agreement with AGI SureTrack. (*See* Exh. A ("Eckart Agreement"), pg. 2). Venue is proper with regard to Eckart pursuant to the same provision.

28.     Personal jurisdiction exists over Folkers because he is domiciled in Missouri and bound by the Jurisdiction and Venue provision of his Confidentiality, Noncompetition and Nonsolicitation Agreement with AGI SureTrack. (*See* Exh. B ("Folkers Agreement"), pg. 4, "Governing Law; Venue"). Venue is proper with regard to Folkers pursuant to the same provision.

29.     Personal jurisdiction exists over Handke pursuant to Missouri's long-arm statute, § 506.500, RSMo, because she has transacted business and committed tortious acts in Missouri, and is bound by the Jurisdiction and Venue provision of her Confidentiality, Noncompetition and Nonsolicitation agreement with AGI SureTrack. (*See* Exh. C ("Handke Agreement"), pg. 3, "Governing Law; Venue"). Venue is proper pursuant to the same provision.

30.     Personal jurisdiction exists over Salisbury because she is domiciled in Missouri and bound by the Jurisdiction and Venue provision of her Confidentiality, Noncompetition and Nonsolicitation agreement with AGI SureTrack. (*See* Exh. D ("Salisbury Agreement"), pg. 2). Venue is proper with regard to Salisbury pursuant to the same provision.

31.     Personal jurisdiction exists over Walters because she is domiciled in Missouri and because she has transacted business and committed tortious acts in Missouri.

32.     Personal jurisdiction exists over Aggregate because Aggregate is registered to do business in Missouri, is transacting business in Missouri, and, upon information and belief, has and continues to commit tortious acts in the state.

6

33.     Venue is appropriate pursuant to 28 U.S.C. § 1391(b)(2). This action arises out of acts and omissions committed in this judicial district and that subject defendants to personal jurisdiction here.

## BACKGROUND FACTS

### Farming in the Unites States

34.     Growers in the United States produce tens of billions of bushels of agricultural commodity products every year.

35.     In 2022, the United States Department of Agriculture estimates that, with respect to what are known of as "row crops," 13.7 billion bushels of corn and 4.28 billion bushels of soybeans (often referred to in the agriculture industry simply as "beans") were produced in the United States. These commodities have a variety of ultimate uses, including for human food, animal feed, in ethanol, and in other products.

36.     Timing for corn harvest will largely depend on the variety of corn, as well as its intended use. Corn harvest typically lasts from August through November before fall fertilizer application begins.

37.     Like corn, the timing for soybean harvest will vary based on a number of factors, including the variety of soybean, weather conditions, and whether they are single or double-crop soybeans. Single crop beans – typically planted earlier – can be harvested starting in late September. Double-crop beans, on the other hand, may not be harvested until late November or early December, depending on moisture level.

38.     Upon information and belief, a significant percentage of all U.S. grain is stored, before it is marketed and sold post-harvest, by individual growers in grain bins, such as the one pictured below:



39.　　It is essential for the grower to maintain a particular temperature and moisture content within the grain bin to ensure that the stored grain is marketable and achieves as high a price as possible, depending on the buyer's specifications.

40.　　For example, corn contains roughly 20% moisture at harvest but, for many buyers, needs to be dried so that it contains about 15% moisture at the time of sale for optimal pricing. Soybeans generally contain approximately 9% moisture at harvest and need to reach 13% moisture at the time of sale.

41.　　Being able to condition grain is important not only for sale purposes, but also to ensure the crops do not spoil.

42.　　The instant dispute involves the sale of AGI SureTrack's technology-based BinManager Product, a grain storage solution that uses advanced sensors, cables, and controls to maintain optimal conditions of stored grain through remote data collection to monitor and record temperature, determine equilibrium moisture content, and automate efficient drying of agricultural commodities inside grain bins.

43.　　Storing and conditioning crops between harvest and sale is an important, complicated, time-consuming, time-sensitive, and potentially dangerous task.

8

44.     AGI SureTrack's technology provides historical trends and real-time remote access to adjust operational settings within the grain bins, offering increased efficiencies, optimal storage conditions, and improved safety with zero-entry bin management. AGI SureTrack has been at the forefront of this innovative technology throughout the company's history.

45.     This sensor data is highly confidential, competitive information because of its impact on farmers' profits. In turn, the success of its client-farmers affects the competitiveness of the company providing grain bin technology. The data is also critical for the creation of what is called an equilibrium moisture content curve ("EMC Curve"), which is used to predict how ambient air will affect the moisture content of grain.

46.     Moreover, the software and device firmware code used in connection with grain bin technologies itself is highly confidential and/or constitutes trade secret information.

## AGI SureTrack and its Products

### AGI SureTrack's History

47.     AGI SureTrack began as an agricultural technology start-up called In Telli Air, which later became known as IntelliAir. Separately, IntelliFarms was founded and then, in 2017, IntelliAir, IntelliFarms, and a company called C2Ag, merged to form IntelliFarms, LLC.

48.     In March 2019, AGI, through its subsidiary, Westfield Distributing (North Dakota) Inc., acquired IntelliFarms through the purchase of all member interests held in the company. In so doing, Westfield, and ultimately Ag Growth International as the ultimate parent company, acquired all of IntelliFarms' agreements, customers, employees and technologies, including the BinManager product, among other things. A few months later, IntelliFarms was then renamed AGI SureTrack, LLC.

9

49.     Although Farmobile was not merged into SureTrack until January 2023, the SureTrack and Farmobile employee teams were merged together much earlier during the summer of 2021. That summer, the CEO of Farmobile, Jason Tatge, was named the AGI's Senior Vice President in charge of AGI SureTrack. Adam Weiss, as SureTrack's former head, was vying for that position for a second time, as he had once before been passed over for the leadership role.

50.     Tatge had a different management style than Weiss. As a result, several of Farmobile's employees were put into positions with management responsibility at AGI SureTrack, or AGI Digital. The changes that occurred made several SureTrack employees unhappy, if not bitter. There was an increase in the number of employee resignations. Walters worked closely with Weiss and others who were unhappy with the changes taking place.

51.     In April 2022, AGI reorganized its marketing department. This reorganizing resulted in the termination of several AGI SureTrack marketing employees, including Walters, Salisbury, and Folkers.

52.     In the fall of 2022, Ag Growth International underwent a change in its management structure and, as a result, the Chief Operations Officer became the company's Chief Executive Officer. This, too, led to changes at AGI Digital, culminating in a reduction in force ("RIF") beginning in January 2023, which was aimed at transforming the ag tech "start-up" into a company with balance sheet discipline.

<u>AGI SureTrack's BinManager Product</u>

53.     The BinManager product is used in connection with the storage of corn, soybeans, and other agricultural commodities in grain bins.

54.     The BinManager product consists of a sophisticated internet of things ("IOT") device that is connected to cables with sensors that collect important data concerning the

10

environment in the bin, including moisture and temperature information, and send it to the cloud where the platform software processes, displays, and stores the bin data for growers to use in connection with managing the storage of their harvested commodities. The data also is used to generate EMC curves and automatically control the grain bin's fans accordingly, which leads to a higher quality commodity that can command a higher price on the market and to more efficient use of the fuel that powers the fans, among other things.

55.    Thus, BinManager product is both an IOT and Software as Service ("SaaS") product.

56.    Customers purchase or lease the BinManager hardware, pay for installation, and pay an annual subscription fee for the software as a service component of the product. Thus, AGI SureTrack receives annual recurring revenue ("ARR") in addition to traditional sales revenue in connection with the BinManager product.

57.    Customers often will try out BinManager on one or a few bins in one growing season and then expand to add more bins the next year. Thus, customer relationships are extremely important to AGI SureTrack.

58.    The BinManager product, and its related ARR from recurring subscription sales, represents a significant portion of AGI SureTrack's revenue.

59.    Just a single BinManager customer, on average, provides AGI SureTrack with gross revenue over the 3-year subscription term in excess of $140,000.00, with a net revenue value to the company of over $50,000.00.

60.    AGI SureTrack has a protectable interest in its customer base, client relationships, confidential information, and trade secrets.

## AGI SURETRACK'S PROTECTION OF CONFIDENTIAL
## AND TRADE SECRET INFORMATION

### AGI SureTrack's Confidential and Trade Secret Information

61.     AGI SureTrack, including its predecessor IntelliFarms, has spent, and continues to spend, millions of dollars to develop, manufacture and improve the BinManager product. AGI SureTrack also has expended substantial sums of money developing its customer relationships.

62.     Through its investment, AGI SureTrack owns and uses a wide variety of trade secret information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes used in connection with grain bin technologies, many of which are described in additional detail herein.

63.     Each customer's BinManager system is uniquely tailored to the particular customer's bins and operation as a whole. No two systems are alike.

64.     AGI SureTrack relies on a network of dealer distributors to obtain leads, make sales of the BinManager product and subscriptions, sell parts, and assist with warranty service, among other things. AGI SureTrack's dealers often have negotiated discounts such that when the make a sale at full price, the discounted amount becomes the dealer's revenue.

65.     AGI SureTrack's marketing department provides significant sales and marketing support to AGI's sales team and dealers. This includes the development of confidential sales and marketing plans; internal information sheets, product updates and product training documents; creation of marketing materials; negotiation and implementation of agreements with dealer and advertising channels; putting on sales clinic that target growers and dealers; developing lead list from trade shows, referrals and other channels, among other things, all of which support the sales department and dealers so they can succeed. The marketing team also attends the highly

confidential and regular product development meetings so they could be aware of new innovation, problems and improvements in AGI SureTrack's products.

66. AGI's national sales team works with BinManager dealers to put together specific proposals for each customer that include all of the unique components and parts needed to install the device, cables and other sensors. Each system is custom manufactured at AGI SureTrack's Lenexa, Kansas facility. AGI employs installers, who climb the bins and install the systems, although in some instances, dealers handle installation. Certain members of the marketing department had access to confidential information stored on the AGI SureTrack sales portal.

67. Because of the complexity and custom nature of the BinManager system, AGI SureTrack, through its employees, has develop methods, techniques, tools, a network of parts suppliers, quoting methodologies, and discounting processes and lead generation techniques, among other things. This proprietary information is highly confidential, and is treated as such by AGI SureTrack. Certain members of the marketing department had access to this confidential information.

68. AGI SureTrack keeps information concerning its customers confidential and accessible to only certain SureTrack and/or AGI employees, all of whom are required to use the company's multi-factor password protection tool. This information includes customer system details and specifications, customer preferences, number of grain bins owned, among other information. As such, this information is important and valuable to AGI SureTrack and its business.

69. AGI SureTrack also possesses confidential sales and marketing information and plans, including sales strategies, targets, and discounting information. Access to this information

is limited to only certain AGI SureTrack and/or AGI employees. This information is extremely important and valuable to AGI SureTrack and its business.

70.     AGI SureTrack's confidential sales and marketing information resides on the AGI network. It is found in the proprietary Quote Tool, the AGI SharePoint secure file server, as well as in numerous documents, such as PowerPoint presentations, Excel spreadsheets, and other documents. These documents are subject to restricted access on a need-to-know basis. It has taken years of effort and the expenditure of substantial sums of money to collect information concerning customers and their needs.

71.     AGI SureTrack's process for pricing and putting together system designs and pricing estimates quoted to each unique customer for the BinManager product and installation is highly confidential. Members of AGI SureTrack's marketing department had access to pricing and system design information in the Quote Tool, Sales Portal and/or the AGI SharePoint secure file server.

72.     AGI SureTrack also offers discounts. The process of determining discounts is highly confidential and has been protected as such by AGI SureTrack. Certain members of AGI SureTrack's marketing department would have had access to the discounting information in the Quote Tool, Sales Portal and/or the AGI SharePoint secure file server.

73.     AGI SureTrack also from time to time engages consultants to assist with business planning and product development. In particular, it retained a well-known, international, management and consulting firm (the "Consulting Firm"), in a two-phase project from August to November 2020, and again from January through June 2021. Phase One involved the detailed refinement of AGI SureTrack's product business model, profitability, and future growth priorities and strategies. The second stage involved analyzing successful and new commercial

levers (value proposition, pricing, sales force effectiveness, building a customer success team, developing comprehensive dealer onboarding/growth strategies), as well as product redesign and cost optimization (design and procurement-oriented leading to full next gen cables and BinManager). The information exchanged with the Consulting Firm was subject to a non-disclosure agreement. All reports and project documents were marked "Confidential." Thus, the Consulting Firm project included extremely valuable and highly confidential business planning information. AGI SureTrack invested a substantial amount of money through payments to the Consulting Firm, as well as employee time and other internal resources.

74.    Certain AGI SureTrack employees, including Walters, AGI SureTrack's former head of marketing, were directly involved in the Consulting Firm project, which culminated in a variety of recommendations for a next generation bin cable and next generation bin manager product.

75.    The Marketing Department also had access to AGI SureTrack's innovative strategies to recruit, segment, and develop dealers and sales opportunities with commercial customers, including highly confidential lists of growers used for targeted grower sales strategies.

76.    All of the information described in this section is of great economic value not only to AGI SureTrack, but also to its competitors who do not possess, or have access to, this information. This information is not generally known to the public, and is not readily ascertainable through proper means. AGI SureTrack has taken, and continues to take, reasonable steps to ensure that its information stays confidential.

15

AGI SureTrack's Protection of its Confidential
and Trade Secret Information

77. Through the IntelliFarms acquisition, discussed above, all assets and agreements flowed through to AGI SureTrack, including all employment related agreements and restrictive covenants.

78. AGI SureTrack undertakes significant effort in protecting its trade secret and confidential information. These protections include physical controls, such as limiting access to the AGI SureTrack facility, as well as technological controls, such as passwords and 2-factor authentication. AGI also employs a user-level permission system on the AGI Sales Portal and AGI SureTrack Platform. AGI also limits access to trade secret information, providing access only to those who need to have such access to do their jobs. AGI SureTrack expects its employees to strictly maintain the confidentiality of its proprietary and trade secret information.

79. Additionally, AGI SureTrack's employee handbook sets out rules concerning the handling of confidential information. Section 4040 of the Handbook states:

**4040: Confidentiality**

Information concerning the business affairs of AGI, its suppliers, customer, employees or personal associated with the Company, is confidential and restricted. Employees may not reveal any information except under the direction of their supervisor or with the supervisor's approval….Further, AGI expects that any knowledge, techniques, written materials and other information relative to the Company's business developed during employment remain the property of the Company.

With regard to Email and Electronic Communication, Section 4090 of the Handbook states:

PROPORIETY INFORMATION RESTRICTIONS
Receiving or downloading, or sending or uploading of proprietary information is prohibited without prior authorization. Such

16

information includes copyrighted materials, trade secrets, proprietary financial information, or other similar materials.

80.     In addition to the handbook, AGI SureTrack's Acceptable Use Policy, (*See* Exh. E), also sets out rules concerning the handling of confidential information. Section 4.2 of the Acceptable Use Policy states:

> Protecting Confidential Data
> Confidential data must not be:
> > A. shared or disclosed in any manner to non-employees of AGI.
> > B. should not be posted on the Internet or any publicly accessible systems.
> > C. Should not be left unattended on desks, in or around printers, in meeting rooms or in other accessible areas.

81.     With regard to email communication, Section 4.1 of the Acceptable Use Policy prohibited the follow actions as "unacceptable use of the AGI email system":

> Send email with information that is considered confidential or proprietary to AGI, regardless of the recipient, without proper encryption.

82.     The same language is found in Section 4.4 of AGI SureTrack's Email Policy (*See* Exh. F, pg. 6-7). Further, Section 4.4.1 of the same policy states:

> Unauthorized emailing of AGI data, confidential or otherwise, to external email accounts for the purpose of saving this data external to AGI systems is prohibited.

83.     AGI SureTrack provides training to its employees concerning the handling of confidential information. The company's managers and supervisors also educate and reinforce the requirement to properly handle and protect confidential and trade secret information.

84.     AGI SureTrack's employees mark product development documents with the following legend:

AG Growth International Ltd. All rights reserved.
The **AGI SureTrack** logo is a Registered Trademark of AG Growth International Ltd.

This document contains **Confidential Information** which is **Proprietary to AGI-SureTrack**. All information disclosed herein is subject to the terms and conditions of
**NDA** signed by the receiving party. No part of this document may be used or reproduced in any form by any means without prior written permission of **AGI-SureTrack**.
Unless otherwise agreed, this document remains the property of **AGI** and must be returned along with any copies thereof.

85.     Emails and other documents containing confidential information are marked with confidentiality designations as well.

86.     AGI SureTrack also protects its investment in its products, including the BinManager product, customer, sales, and marketing information, by requiring employees to enter into confidentiality, non-competition, and non-solicitation agreements.

87.     AGI SureTrack invested a substantial sum of money in the Consulting Firm project. The resulting reports, with the detailed information and recommendations therein, are highly confidential and of great value to the company.

## AGI SURETRACK'S COMPETITION

88.     There are four primary companies who frequently compete with each other for new customers in the grain bin monitoring technology space: AGI SureTrack, OPI Grain Systems, GSI, and Tri-States.

89.     OPI Grain Systems is one of AGI SureTrack's primary competitors in the Midwest. OPI is an agricultural technology company based in Canada, which, like AGI SureTrack, specializes in grain storage management. Although based in Canada, OPI also services the agricultural industry in the United States and elsewhere. OPI Systems competes with AGI SureTrack directly to provide temperature and moisture monitoring technology for farm and commercial grain bins, including cabling systems, hardware, firmware and software. In particular, the OPI Blue product competes directly with BinManager, although the system design varies and it lacks certain features and advantageous attributes of the AGI SureTrack product.

90.     Consistent with AGI SureTrack's own advertising of BinManager, OPI advertises that OPI Blue provides automated fan control, remote updates to mobile or desktop devices to prevent spoilage, wireless 24/7 temperature and moisture monitoring, improved moisture and temperature control to optimize conditions, and to maximize the value of stored assets.

91.     As stated above, OPI has met with, recruited, and/or hired AGI SureTrack's employees and former employees, including two employees at the director level and above. OPI also is now working closely with IFND, who has hired two of AGI's salespeople, Norbert Strasser and H. John Lawrence, providing an opportunity to obtain information through IFND. Many of these employees, including defendants, were intimately familiar with AGI SureTrack's trade secret information, including its sales and customer data, and the specific workings of its BinManager technology.

92.     Upon information and belief, OPI is working to find ways to use AGI SureTrack's hardware to connect to the OPI system. Accomplishing this would present a significant advantage to OPI.

93.     Upon information and belief, OPI representatives have boasted to AGI's current and prospective customers and dealers that it was working on "developing a system just like BinManager," or words to that effect.

## DEFENDANT AGGREGATE'S BUSINESS

94.     Upon information and belief, Aggregate was formed by Walters and Salisbury on or about May 9, 2022. Walters is listed as Aggregate's registered agent, while Salisbury is listed as its organizer on the official Articles of Organization filed with the Missouri Secretary of State publicly available website.

95.     Aggregate is a marketing agency. On its webpage, Aggregate describes its team as "strategizers, storytellers, event planners, and . . . connectors," with a "table of experience from livestock production to the utilization of the latest agricultural technology." Aggregate aims to turn "marketing aspirations into tangible sales conversations" by "delv[ing] into the essence of [clients'] business … to craft strategies and campaigns that … connect with every stakeholder in the value chain." *See* https://goaggregate.com. Its LinkedIn page offers further insight: "Based in the heart of America, we promote manufacturing, engineering and technology that further global sustainability." https://www.linkedin.com/company/goaggregate/about/.

96.     Among other services, Aggregate promotes itself as providing strategy, media planning, event hosting, content creating/marketing, lead generation, web development, business development, brand management, automation, and list generation.

97.     As discussed more fully in the next sections, Aggregate now employs Walters, Folkers, Handke, Eckart, and Salisbury. In effect, then, Aggregate is an excised portion of AGI SureTrack's marketing department that is now providing services to and for direct competitors of AGI SureTrack.

98.     On its publically available website, Aggregate lists direct competitors of AGI SureTrack as clients, including OPI, 4B Components, and IFND.

99.     It also lists Valley View Agri-Systems, one of AGI SureTrack's dealers who has been approached by Brett Andricks, OPI's new sales director and former AGI SureTrack sales lead, in an effort to recruit the company to sell OPI's products, presumably instead of AGI SureTrack's :



Meet Our Clients

# Partners In Growth

At Aggregate, we're not just about cultivating success, we're about cultivating relationships.
We're thrilled to introduce you to some of the extraordinary companies we've had the pleasure of working with.

    

    

Source: https://goaggregate.com/about#team.

100.     Aggregate, OPI's "agency of record," oversaw the recent redesign of OPI's logo and brand identity announced on or around July 2, 2023.

101.     4B Components is a direct competitor with AGI SureTrack's custom grain bin monitoring product ("CMC") line.

102.     IFND, through its sales of OPI's bin management products, is a direct competitor of AGI SureTrack.

103.     Additionally, Aggregate also lists SouthEast Grain Management as a client. SouthEast Grain is a legacy BinManager/SureTrack Dealer and, upon information and belief, has begun to sell OPI products.

## THE INDIVIDUAL DEFENDANTS' AGREEMENTS AND CONDUCT

### Eckart's AGI SureTrack Employment

104.     Eckart joined IntelliFarms, LLC in October 2017 as a Graphic Designer, and reported to Walters. Following AGI SureTrack's acquisition of the company, Eckart remained in marketing as Marketing Manager with AGI SureTrack.

21

105.     In his role as Marketing Manager, Eckart had access to AGI SureTrack's highly confidential dealer lists, dealer information, dealer discounts, marketing plans and strategies, sales support and training, and future product development strategies, all of which were treated as confidential by AGI SureTrack.

106.     At all times during his employment, Eckart was bound by the terms of the Eckart Agreement. Exh. A.

107.     Under the terms of the Eckart Agreement, and in exchange for and in consideration of his employment, Eckart was obligated to maintain the secrecy of AGI SureTrack's confidential information and technical developments, including after the cessation of his employment, and not share that information with any other person or entity:

> 2.     <u>Non-Solicitation: Non-Competition; Confidentiality and Non-Disclosure.</u>
>
> Employee shall not, during the term of this Agreement and after the termination of the Employment for any reason whatsoever, directly or indirectly:
>
> a.     Found, work for, consult or assist. in any way, directly or indirectly, whether in a paid or unpaid capacity, any individual, partnership, company, employer or other business entity that competes with Employer in the agricultural or grain bin management industries. This restriction shall last for a period of two (2) years and shall cover the following geographic area: [Insert geographic scope of non-compete].
>
> b.     Solicit the trade or patronage of any of Employer's former, existing or prospective customers or clients, including, without limitation, [insert specific name of customers sought to be protected]. This restriction shall last for a period of two (2) years.
>
> c.     Utilize, other than for the benefit of Employer, or disclose to any third party any of Employer's trade secrets or proprietary technical knowledge, including, without limitation, those trade secrets and items of proprietary technical knowledge set forth on Schedule B attached hereto and incorporated herein by this reference.

Eckart Agreement, Section 2 (Exh. A).

108.    In the same provision, Eckart agreed to a non-compete and non-solicitation obligation. *Id.*

109.    Eckart agreed that a "[i]n addition to whatever other remedies Company may have at law, in equity or pursuant to this Agreement, Independent Contractor specifically agrees that Company is entitled to apply to any court of competent jurisdiction to enjoin any actual or threatened breach of the restrictions contained herein by Independent Contractor." *Id.* at Section 4(e).

110.    The restrictions imposed by the Eckart Agreement were warranted because of Eckart's access to confidential and trade secret information, the resources AGI SureTrack spent in training and enhancing his skills and experience, and in order to retain and maintain AGI SureTrack's customer relationships and market position. The Eckart Agreement included a provision whereby AGI SureTrack is entitled to recover its attorneys' fees and costs associated with enforcing the Agreement. *Id.* at Section 3.

111.    The confidential and trade secret information Eckart was exposed to is of great economic value, not only to AGI SureTrack, but also to its competitors who do not possess, or have access to, this information. This information is not generally known to the public, and is not readily ascertainable through proper means. AGI SureTrack has taken and continues to take reasonable steps to ensure that the information Eckart had access to stays confidential, as discussed above.

112.    Eckart resigned from AGI SureTrack by letter dated August 11, 2022.

113.    Eckart's last day of employment with AGI SureTrack was August 29, 2022.

114.    At the time of his departure, Eckart only returned AGI SureTrack's company-issued electronic devices. He made no return of paper documents or other materials containing AGI SureTrack's confidential and trade secret information.

115.    Eckart was required to comply with all employee policies, as has been the case with all AGI SureTrack employees. These include the employee handbook, Acceptable Use Policy, and Email Policy. *See* ¶¶ 79-82 above.

### Eckart's Employment with Aggregate

116.    Eckart joined Aggregate in September 2022. According to his LinkedIn page, he is a "Partner" at Aggregate focused on "Creative & Strategy."

117.    According to the Aggregate website, Eckart is the company's "Captain of Cultivation." In this role, Eckart's responsibilities include brand development, digital and print marketing campaigns, and optimizing user experience. Aggregate describes Eckart as "combin[ing] creative ingenuity with meticulous attention to detail" to "creat[e] compelling narratives" while bringing a "strategic approach" to each campaign he plans and executes.

118.    Upon information and belief, Eckart's position at Aggregate involves specialized tasks nearly identical to those he performed at AGI SureTrack.

119.    Eckart, by virtue of his position and years of experience with AGI SureTrack, is uniquely positioned to facilitate Aggregate's efforts to assist OPI, IFND, and other competitors of AGI SureTrack, in competing with AGI SureTrack's technology and for the business of AGI's customers.

**Folkers' AGI SureTrack Employment**

120.     Folkers joined IntelliFarms, LLC in October 2017 as a Graphic Designer, and reported to Walters. Following AGI SureTrack's acquisition of the company, Folkers remained in marketing as Marketing Manager with AGI SureTrack.

121.     Folkers had access to AGI SureTrack's highly confidential dealer lists, dealer information, dealer discounts, marketing plans and strategies, product information, video/visual imagery of products and installation, knowledge of end customers, and future product development strategies, all of which were treated as confidential by AGI SureTrack.

122.     Folkers is bound by the terms of the Folkers Agreement. Exh. B.

123.     Under the terms of the Folkers Agreement, and in exchange for and in consideration of his employment, Folkers was obligated to maintain the secrecy of AGI SureTrack's confidential information and technical developments, including after the cessation of his employment, and not share that information with any other person or entity:

> **Confidential Information**. Employee will, during the course of Employee's employment and at all times subsequent to Employee's employment, hold in strictest and total confidence all Confidential Information. Employee will at no time, without prior written authorization by Company, disclose, assign, transfer, convey, communicate or use for the benefit of any person or entity other than an IntelliAir Group Company any Confidential Information.
>
> Folkers Agreement, pg. 1 (Exh. B).

124.     Folkers agreed to a non-compete provision as follows:

> **Noncompetition**. During Employee's employment with Company, and for a period of two (2) years after the termination of that employment, Employee will not, directly or indirectly: (i) engage or invest in, own, manage; operate, finance, control or participate in the ownership, management, operation, financing or control of, (ii) be employed by, associated with or in any manner connected with, or (iii) render services or advice to, any business whose services, products or activities compete, directly or indirectly, in whole or in

25

part, with the IntelliFarms Business, anywhere within the geographic area or areas described on the signature page hereof; provided, however, that Employee may purchase or otherwise acquire up to one percent ( 1 %) of any class of securities of any enterprise if those securities are listed on any national or regional securities exchange or have been registered under Section l 2(g) of the Securities Exchange Act of 1934.

*Id.* at pg. 3.

125.    Folkers further agreed to a non-solicitation provision.

**<u>Nonsolicitation of Employees, Customers, and Others</u>**. During Employee's employment with Company, and for a period of two (2) years after the termination of that employment, Employee will not, directly or indirectly, for Employee's own behalf or on behalf of any person or entity: (i) induce or attempt to induce any employee of an IntelliFarms Group Company to leave the employ of that company, or in any way interfere with the relationship between such company and such employee, (ii) induce or attempt to induce any supplier, distributer, vendor, licensee or other business relation of an IntelliFarms Group Company to cease doing business with that Company, or (iii) solicit, divert, take away or attempt to take away the business of any of the IntelliFarms Group's customers with which Employee worked or had contact, or related to which Employee had Confidential Information, during Employee's employment with Company.

*Id.* at pg. 3.

126.    Folkers agreed that IntelliFarms was entitled to specific remedies for breach, including (i) to enjoin an actual or threatened breach of the IntelliFarms Form Agreement, and (ii) to an accounting and repayment of all profits, compensation, commissions, remunerations, or benefits stemming from any breach. *Id.* at pg. 4. Folkers further agreed to waive a jury trial. *Id.* at pg. 5.

127.    Folkers was obligated to deliver to AGI SureTrack, promptly upon his departure, all records and materials containing confidential information. *Id.* at pg. 3.

128.    Folkers also agreed that the restrictions imposed by the confidentiality, non-compete, and non-solicitation agreement were fair and reasonable. *Id.* at pg. 3.

129.    The restrictions imposed on by the Folkers Agreement were warranted because of Folkers' access to confidential information and trade secrets, because of the resources AGI SureTrack spent in training and enhancing his skills and experience, and in order to retain and maintain AGI SureTrack's customer relationships and market position.

130.    In his positions with AGI SureTrack, Folkers had access to AGI SureTrack's confidential and trade secret information, including information on all aspects of BinManager product pricing; discounting; sales strategies; dealer support materials; product information; website development and content, training documents, video/visual imagery of products and their installation; detailed customer information; sales team bonus structure, targets and plans; planned product development; trade show plans; limitations and competitive advantages and disadvantages associated with the BinManager product, among other things.

131.    The information that Folkers was exposed to is of great economic value, not only to AGI SureTrack, but also to its competitors who do not possess, or have access to, this information. This information is not generally known to the public, and is not readily ascertainable through proper means. AGI SureTrack has taken and continues to take reasonable steps to ensure that the information Lawrence had access to stays confidential, as discussed above.

132.    Folkers' last day of employment with AGI SureTrack was April 21, 2022.

133.    At the time of his departure, Folkers only returned AGI SureTrack's company-issued electronic devices. He made no return of paper documents or other materials containing AGI SureTrack's confidential and trade secret information.

27

134. On April 23, 2022, Folkers executed a severance agreement (the "Folkers Severance Agreement") (Exh. G).

135. The Folkers Severance Agreement contained a "Return of Information" provision which stated:

> **Return of Information; Cooperation in Investigations.**
> Employee shall promptly return to Employer all copies of price lists, customer lists, business plans, or other confidential materials of Employer and shall not take or copy such in any manner or form. Employee represents that Employee has held all such Employer confidential information in confidence and will continue to do so, and that Employee will not use such information for any business purpose without the prior written consent of Employer. Employee also agrees that he will make himself available for interview, provide truthful information, and otherwise cooperate in any workplace investigations as may be requested by Employer.
>
> Folkers Severance Agreement, pg. 3 (Exh. G).

136. Folkers was required to comply with all employee policies, as has been the case with all AGI SureTrack employees. These include the employee handbook, Acceptable Use Policy, and Email Policy. *See* ¶¶ 79-82 above.

### Folkers' Aggregate Employment

137. Folkers joined Aggregate in May 2022, as "Digital Irrigator." In this role, Folkers' responsibilities include developing digital brand experiences. Aggregate describes Folkers as "the trendsetter" keeping the company "ahead of the curve by utilizing the latest technology and trans in his work" to deliver "engaging digital experiences through [clients'] brand."

138. Upon information and belief, Folkers' position at Aggregate involves specialized tasks nearly identical to those he performed at AGI SureTrack.

28

139.     Folkers, by virtue of his position and years of experience with AGI SureTrack, is uniquely positioned to facilitate Aggregate's efforts to assist OPI, IFND, and other competitors of AGI SureTrack, in competing with AGI SureTrack's technology and for the business of AGI's customers.

### Handke's AGI SureTrack Position

140.     Handke joined IntelliFarms LLC as an independent contractor in July 2019, and reported to Walters. Following AGI SureTrack's acquisition of the company, Handke remained in marketing as Content Manager with AGI SureTrack.

141.     In her role as Content Manager, Handke had access to AGI SureTrack's highly confidential lead generation, trade show strategies, insights into specific product uses by specific customers, and future product development strategies, all of which were treated as confidential by AGI SureTrack.

142.     Handke is bound by the terms of the Handke Agreement. Exh. C.

143.     Under the terms of the Handke Agreement, Handke was obligated to maintain the secrecy of AGI SureTrack's confidential information and technical developments, including after the cessation of her employment, and to not share that information with any other person or entity:

> **Confidential Information.** Independent Contractor will, during the course of Independent Contractor's contractual relationship with Company and at all times subsequent to Independent Contractor's contractual relationship with Company, hold in strictest and total confidence all Confidential Information. Independent Contractor will at no time, without prior written authorization by Company, disclose, assign, transfer, convey, communicate or use for the benefit of any person or entity other than an Intellifarms Group Company any Confidential Information. The term "*Confidential Information*" will mean any information relating to or dealing with the Intellifarms Business, including Work Product (as defined below), trade secrets, know-how and other intellectual property;

133936626.1

past, current and prospective customer, supplier, distributor and vendor information; business, marketing and strategic plans; financial and sales information and forecasts; cost and pricing data; information relating to products, research and development and manufacturing processes, facilities and methods; computer systems, software and databases; personnel information and records; and legal records. The term Confidential Information will not apply to information that is or becomes public knowledge or ascertainable from public sources, other than through the fault of Independent Contractor.

Handke Agreement, pg. 1 (Exh. C).

144.    Handke agreed to a non-compete provision as follows:

**Noncompetition**. During Employee's employment with Company, and for a period of two (2) years after the termination of that employment, Employee will not, directly or indirectly: (i) engage or invest in, own, manage; operate, finance, control or participate in the. ownership, management, operation, financing or control of, (ii) be employed by, associated with or in any manner connected with, or (iii) render services or advice to, any business whose services, products or activities compete, directly or indirectly, in whole or in part, with the IntelliFarms Business, anywhere within the geographic area or areas described on the signature page hereof; provided, however, that Employee may purchase or otherwise acquire up to one percent (l%) of any class of securities of any enterprise if those securities are listed on any national or regional securities exchange or have been registered under Section l 2(g) of the Securities Exchange Act of 1934.

*Id.* at pg. 2.

145.    Handke further agreed to a non-solicitation provision as follows:

**Nonsolicitation of Employees, Customers, and Others**. During Independent Contractor's contractual relationship with Company, and for a period of two (2) years after the termination of such relationship, Independent Contractor will not, directly or indirectly, for Independent Contractor's own behalf or on behalf of any person or entity: (i) induce or attempt to induce any employee of an Intellifarms Group Company to leave the employ of that company, or in any way interfere with the relationship between such company and such employee, (ii) induce or attempt to induce any supplier, distributor, vendor, licensee or other business relation of an Intellifarms Group Company to cease doing business with that

30

company, or (iii) solicit, divert, take away or attempt to take away the business of any of the Intellifarms Group's customers with which Independent Contractor worked or had contact, or related to which Independent Contractor had Confidential Information, during Independent Contractor's contractual relationship with Company.

*Id.* at pg. 4.

146.    Handke agreed that a "[i]n addition to whatever other remedies Company may have at law, in equity or pursuant to this Agreement, Independent Contractor specifically agrees that Company is entitled to apply to any court of competent jurisdiction to enjoin any actual or threatened breach of the restrictions contained herein by Independent Contractor. " *Id.* at pg. 2.

147.    Handke was obligated to deliver to AGI SureTrack, promptly upon her departure, all records and materials containing confidential information. *Id.* at pg. 2.

148.    Handke also agreed that the restrictions imposed by the Handke Agreement were fair and reasonable. *Id.* at pg. 2.

149.    The restrictions imposed by the Handke Agreement were warranted because of Handke's access to confidential information and trade secrets, because of the resources AGI SureTrack spent in training and enhancing her skills and experience, and in order to retain and maintain AGI SureTrack's customer relationships and market position.

150.    During her tenure with AGI SureTrack, Handke had access to AGI SureTrack's confidential and trade secret information, including information on trade show plans and limitations and competitive advantages and disadvantages associated with the BinManager product, among other things.

151.    The information that Handke was exposed to is of great economic value, not only to AGI SureTrack, but also to its competitors who do not possess, or have access to, this information. This information is not generally known to the public, and is not readily

ascertainable through proper means. AGI SureTrack has taken and continues to take reasonable steps to ensure that the information Tackett had access to stays confidential, as discussed above.

152.    Handke was last paid for a project by AGI SureTrack in June 2022.

153.    Upon information and belief, Handke failed to return any paper documents or other materials containing AGI SureTrack's confidential and trade secret information.

**Handke's Aggregate Employment**

154.    Upon information and belief, Handke joined Aggregate LLC in the summer of 2023.

155.    Handke is the "Content Combine" at Aggregate. In this role, Handke's responsibilities include brand development. Aggregate describes Handke as having "the unique ability to transform complex concepts into engaging narratives" to ensure clients' brands "leave a lasting impression."

156.    Upon information and belief, Handke's position at Aggregate involves specialized tasks nearly identical to those she performed at AGI SureTrack.

157.    Handke, by virtue of her position and years of experience with AGI SureTrack, is uniquely positioned to facilitate Aggregate's efforts to assist OPI, IFND, and other competitors of AGI SureTrack, in competing with AGI SureTrack's technology and for the business of AGI's customers.

**Salisbury's AGI SureTrack Employment**

158.    Salisbury was employed at IntelliFarms LLC as an Events Coordinator Receptionist, and reported to Walters. Following AGI SureTrack's acquisition of the company, Salisbury remained in marketing as Events/Information Coordinator with AGI SureTrack.

159. In her role as Events/Information Coordinator, Salisbury had access to AGI SureTrack's tradeshow strategies, lead generation strategies, dealer marketing support materials, and logistics and coordination of most marketing activities, all of which were treated as confidential by AGI SureTrack.

160. Salisbury is bound by the Salisbury Agreement. Exh. D.

161. The Salisbury Agreement contains the same "Non-Solicitation; Non-Competition; Confidentiality and Non-Disclosure" provision (*id*. at Section 2), and the same remedies for breach provision (*id.* at Section 4(e)), as were set forth fully above in the Eckart Agreement. *See* ¶¶ 106-109 herein.

162. The restrictions imposed by the Salisbury Agreement were warranted because of Salisbury's access to confidential information and trade secrets, because of the resources AGI SureTrack spent in training and enhancing her skills and experience, and in order to retain and maintain AGI SureTrack's customer relationships and market position. The Salisbury Agreement included a provision whereby AGI SureTrack is entitled to recover its attorneys' fees and costs associated with enforcing the Agreement. Salisbury Agreement. Exh. D, Section 3.

163. During her tenure with AGI SureTrack, Salisbury had access to AGI SureTrack's confidential and trade secret information, including information on trade show plans and limitations and competitive advantages and disadvantages associated with the BinManager product, among other things.

164. The information that Salisbury was exposed to is of great economic value, not only to AGI SureTrack, but also to its competitors who do not possess, or have access to, this information. This information is not generally known to the public, and is not readily

33

ascertainable through proper means. AGI SureTrack has taken and continues to take reasonable steps to ensure that the information Tackett had access to stays confidential, as discussed above.

165.     Salisbury's last day of employment with AGI SureTrack was April 21, 2022.

166.     On April 22, 2022, Salisbury executed a severance agreement, (the "Salisbury Severance Agreement") (*See* Exh. H).

167.     The Salisbury Severance Agreement contained a "Return of Information" provision which stated:

> **Return of Information; Cooperation in Investigations.**
> Employee shall promptly return to Employer all copies of price lists, customer lists, business plans, or other confidential materials of Employer and shall not take or copy such in any manner or form. Employee represents that Employee has held all such Employer confidential information in confidence and will continue to do so, and that Employee will not use such information for any business purpose without the prior written consent of Employer. Employee also agrees that he will make himself available for interview, provide truthful information, and otherwise cooperate in any workplace investigations as may be requested by Employer.
>
> *Id.* at pg. 3.

168.     At the time of her departure, Salisbury only returned AGI SureTrack's company-issued electronic devices. She made no return of paper documents or other materials containing AGI SureTrack's confidential and trade secret information.

169.     Salisbury was required to comply with all employee policies, as has been the case with all AGI SureTrack employees. These include the employee handbook, Acceptable Use Policy, and Email Policy. *See* ¶¶ 79-82 above.

### Salisbury's Aggregate Employment

170.     Salisbury joined Aggregate in May 2022.

171.     Salisbury is the "Farmstead Facilitator" at Aggregate. In this role, Salisbury's responsibilities include event planning, promo management, and overseeing trade shows and certifications. Aggregate describes Salisbury as having "an eye for detail and a talent for planning" to execute "seamless and efficient" projects.

172.     Upon information and belief, Salisbury's position at Aggregate involves specialized tasks nearly identical to those she performed at AGI SureTrack.

173.     Salisbury by virtue of her position and years of experience with AGI SureTrack, is uniquely positioned to facilitate Aggregate's efforts to assist OPI, IFND, and other competitors of AGI SureTrack, in competing with AGI SureTrack's technology and for the business of AGI's customers.

### Walters' AGI SureTrack Employment

174.     Walters joined IntelliFarms as Chief Marketing Officer on June 28, 2019.

175.     Following AGI SureTrack's acquisition of the company, Walters became the Chief Marketing Officer for AGI SureTrack.

176.     In her role as Chief Marketing Officer, Walters had access to AGI SureTrack's confidential and trade secret information, including dealer lists, dealer information, dealer discounts, cost and margin data, future strategies, and information on all aspects of BinManager product pricing; discounting; sales strategies; limitations and competitive advantages and disadvantages associated with the BinManager product, among other things. Walters was also included in meetings and presentations to the AGI executive team, where she learned highly confidential information, including information related to the broader expansion of new product plans and how AGI SureTrack would be incorporated into other AGI products, such as Augers, grain dryers, plant management/blending equipment, and the like.

35

177.    The information that Walters was exposed to is of great economic value, not only to AGI SureTrack, but also to its competitors who do not possess, or have access to, this information. This information is not generally known to the public, and is not readily ascertainable through proper means. AGI SureTrack has taken and continues to take reasonable steps to ensure that the information Walters had access to stays confidential, as described above.

178.    Walters' last day of employment with AGI SureTrack was April 21, 2022, due to a reorganization of the AGI SureTrack marketing department.

179.    At the time of her departure, upon information and belief, Walters only returned AGI SureTrack's company-issued electronic devices. She made no return of paper documents or other materials containing AGI SureTrack's confidential and trade secret information.

180.    On April 24, 2022, Walters executed a severance agreement (the "Walters Severance Agreement") (Exh. I).

181.    The Walters Severance Agreement contained a "Return of Information" provision which states:

> **Return of Information**. Employee shall promptly return to Employer all copies of price lists, customer lists, business plans, or other confidential materials of Employer and shall not take or copy such in any manner or form. Employee represents that Employee has held all such Employer confidential information in confidence and will continue to do so, and that Employee will not use such information for any business purpose without the prior written consent of Employer.
>
> Walters Severance Agreement, ¶ 12. (Exh. I).

182.    Walters was required to comply with all employee policies, as has been the case with all AGI SureTrack employees. These include the employee handbook, Acceptable Use Policy, and Email Policy. *See* ¶¶ 78-82 above.

36

183.    Less than a month after Walters' termination from AGI SureTrack, she formed Aggregate. Walters is the Owner and "Project Planter" of Aggregate, where she "brings a blend of creativity and strategic acumen" to provide full services marketing to agriculture clients, including direct competitors of AGI SureTrack. Aggregate describes Walters as "an engine for business growth" with "expertise [] in crafting tailored strategies that align with [clients'] budget and objectives, ensuring [client] brand's message reaches its intended audience with maximum impact through networking, media planning and creative opportunities."

184.    Upon information and belief, Walters' position at Aggregate involves specialized tasks nearly identical to those she performed at AGI SureTrack.

185.    Walters, by virtue of her position and years of experience with AGI SureTrack, is uniquely positioned to facilitate Aggregate's efforts to assist OPI, IFND, and other competitors of AGI SureTrack, in competing with AGI SureTrack's technology and for the business of AGI's customers.

## DEFENDANTS' WRONGFUL ACTS

### Eckart's Wrongful Conduct

186.    Eckart was contractually barred from consulting with, or rendering any advice or other services to, a competitor of AGI SureTrack for 2 years from August 29, 2022.

187.    Despite that prohibition, Eckert immediately began to violate his non-compete by going to work for Aggregate and, as an employee of Aggregate, consulting for or rendering services or advice to AGI SureTrack's competitors—namely, OPI and IFND.

188.    Thus, Eckart violated and continues to violate his restrictive covenants by working for Aggregate, which partners with OPI, a direct competitor of AGI SureTrack.

189.     Upon information and belief, Eckart's new position with Aggregate is nearly identical to his position with AGI SureTrack, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of AGI SureTrack.

190.     Eckart has intentionally placed himself in a position to wrongfully use, and/or inevitably use, AGI SureTrack's confidential information and trade secrets that he learned during his employment with AGI SureTrack.

191.     The confidential information and trade secrets to which Eckart had access will directly aid his employment with Aggregate.

192.     Further, on August 17 and August 19, 2022, one week after giving notice of his resignation, Eckart deleted, without explanation or express permission, a large number of AGI company-owned OneDrive files from his company-issued computer.

193.     On August 24 and August 27, 2022, Eckart downloaded marketing materials from AGI SureTrack's system, including marketing agreements, marketing materials, and pricing and financing materials. The titles of the documents downloaded included "Ag PhD Mktg Agmt," "DirectMailer_QuoteYourUpgrade_R6," and "DirectMailer_QuoteYourUpgrade_ R6_PRESS."

194.     The documents noted in ¶ 193 herein include AGI's highly confidential trade secret information. This information was compiled through years of work and significant financial investments. As such, this information is highly valuable and cannot be obtained elsewhere and thus, has independent economic value that would benefit any competitor, including IFND and OPI.

195.     Eckart had no legitimate business purpose for accessing, downloading, or forwarding this confidential and trade secret information, particularly after his notice of resignation on August 11, 2022.

**Folkers' Wrongful Conduct**

196.    Folkers was contractually barred from consulting with, or rendering any advice or other services to, a competitor of AGI SureTrack for 2 years from April 21, 2022.

197.    Despite that prohibition, Folkers immediately began to violate his non-compete by going to work for Aggregate and, as an employee of Aggregate, consulting for or rendering services or advice to AGI SureTrack's competitors—namely, OPI and IFND.

198.    Thus, Folkers violated and continues to violate his restrictive covenants by working for Aggregate, which partners with OPI, a direct competitor of AGI SureTrack.

199.    The confidential information and trade secrets to which Folkers had access will directly aid his employment with Aggregate.

200.    Upon information and belief, Folkers' new position with Aggregate is nearly identical to his position with AGI SureTrack, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of AGI SureTrack.

201.    Further, on April 21, 2022, the last day of his employment at AGI SureTrack, Folkers, without explanation or permission, deleted a large number of AGI's company-owned OneDrive files.

**Handke's Wrongful Conduct**

202.    Handke was contractually barred from consulting with, or rendering any advice or other services to, a competitor of AGI SureTrack for 2 years.

203.    Despite that prohibition, Handke immediately began to violate her non-compete by going to work for Aggregate and, as an employee of Aggregate, consulting for or rendering services or advice to AGI SureTrack's competitors—namely, OPI and IFND.

204.    Thus, Handke violated and continues to violate her restrictive covenants by working for Aggregate, which partners with OPI, a direct competitor of AGI SureTrack.

205.    The confidential information and trade secrets to which Handke had access will directly aid her employment with Aggregate.

206.    Upon information and belief, Handke's new position with Aggregate is nearly identical to her position with AGI SureTrack, such that she could not reasonably be expected to fulfill her new job responsibilities without utilizing the trade secrets of AGI SureTrack.

### Salisbury's Wrongful Conduct

207.    Salisbury was contractually barred from consulting with, or rendering any advice or other services to, a competitor of AGI SureTrack for 2 years from April 21, 2022.

208.    Despite that prohibition, Salisbury immediately began to violate her non-compete by going to work for Aggregate and, as an employee of Aggregate, consulting for or rendering services or advice to AGI SureTrack's competitors—namely, OPI and IFND.

209.    Thus, Salisbury violated and continues to violate her restrictive covenants by working for Aggregate, which partners with OPI, a direct competitor of AGI SureTrack.

210.    The confidential information and trade secrets to which Salisbury had access will directly aid her employment with Aggregate.

211.    Upon information and belief, Salisbury's new position is nearly identical to his position with AGI SureTrack, such that she could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of AGI SureTrack.

### Walters' Wrongful Conduct

212.    While working at AGI SureTrack, Walters, on multiple occasions, copied and/or sent AGI's confidential information to her personal or other email address:

raw.designer@gmail.com. Several of these emails concerned Valley View Agri-Systems, a current Aggregate customer.

213. Walters, upon information and belief, began making plans to leave AGI SureTrack and form a company to service AGI SureTrack's competitors while still employed at AGI SureTrack.

214. Upon information and belief, Walters began considering starting her own marketing company and potential new job opportunities prior to her departure.

215. Upon information and belief, at some point prior to her departure, Walters connected an AGI account to her personal iCloud storage location as she received at least two 2 (2) email alerts in her AGI emails that her iCloud storage was full.

216. On April 19, two days prior to her departure, a USB device connected Walters' company-issued device.

217. Upon information and belief, Walters downloaded confidential and trade secret information when she connected USB devices to her company-issued device.

218. Upon information and belief, Walters is using confidential information for the benefit of Aggregate and its client OPI, and against AGI SureTrack.

219. Walters violated her severance agreement by founding an agricultural marketing firm servicing AGI SureTrack's competitors.

220. The confidential information and trade secrets to which Walters had access will directly aid Aggregate and directly or indirectly aid OPI and IFND.

221. Upon information and belief, Walters' new position is nearly identical to her position with AGI SureTrack, such that she could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of AGI SureTrack

41

133936626.1

**Aggregate's Wrongful Conduct**

222.    Aggregate is a marketing firm founded by Walters.

223.    Aggregate currently employs Walters, Eckart, Folkers, Handke, and Salisbury.

224.    Multiple AGI SureTrack competitors, including OPI and IFND, are listed on the Aggregate website as clients.

225.    Moreover, Aggregate is OPI's "agency of record" and recently oversaw the redesign of OPI's logo and brand identity introduced on or around July 2, 2023.

226.    Upon information and belief, Walters, Eckart, Folkers, Handke, and Salisbury, through their status as employees of Aggregate, provide services to or work for OPI and other AGI SureTrack competitors and, in so doing, have used and/or are likely to use AGI SureTrack's confidential and/or trade secret information.

227.    On information and belief, defendant Aggregate has interfered with business relationships of AGI SureTrack, including but not limited to customer relationships and relationships with employees.

**Damage to AGI SureTrack**

228.    The above conduct, coupled with the fact that most, if not all, of the defendants now hold positions Aggregate that are identical to the ones they held at AGI SureTrack, indicates that Defendants have, or are likely to, misappropriate AGI SureTrack's confidential and trade secret information.

229.    Aggregate lists various direct competitors of AGI SureTrack on its website as clients, including OPI, IFND, 4B Components, and SouthEast Grain Management

230.     OPI's customer market and business are so similar to AGI's that defendants, in their nearly identical roles, could not reasonably be expected to fulfill their new job responsibilities without utilizing AGI SureTrack's confidential and trade secret information.

231.     Defendants' knowledge of AGI SureTrack's confidential and trade secret information, including the materials and specific information taken by defendants Eckart and Walters as noted in ¶¶ 193-194, 216-17 above, have been or will be used by defendants in their roles at Aggregate to more quickly develop marketing plans, campaigns, and other materials for all of their customers, including AGI SureTrack's direct competitors.

232.     As noted above, agriculture in the United States is a seasonal activity. Planting generally occurs in the spring, and harvest takes place in the fall.

233.     Given this seasonality, subscriptions for AGI SureTrack's platform are yearly and many growers look to add or purchase BinManager for their grain bins after or just before a given year's harvests.

234.     Additionally, in agriculture, like elsewhere, a goal of any platform software is to gain system adoption because customers typically are hesitant to change systems once they have purchased and mastered one. This is known as "platform stickiness." This platform stickiness, in turn, leads to greater annual recurring revenue in the form of subscriptions to use the product each year.

235.     Platform stickiness is particularly important in agriculture given the seasonality of the industry and the key times when customers typically adopt new products.

236.     Accordingly, influence over AGI SureTrack's substantial customer relationships is particularly relevant just before the fall harvest.

237.     As a result of the defendants' breaches and the misappropriation of AGI SureTrack's confidential and trade secret information, AGI SureTrack has suffered and will continue to suffer additional damage through the loss of existing customers and dealers and/or diversion of existing customers and/or dealers, which continue to accrue, in an amount to be proven at trial.

238.     AGI SureTrack lacks an adequate remedy at law for any past and future acts by defendants that may damage its customer relationships and business reputation and further lacks an adequate remedy for any disclosure of certain confidential information to competitors.

## COUNT I

### Breach of Contract – Confidential Information Provisions
### (Against Defendants Eckart, Folkers, Handke, and Salisbury)

239.     AGI SureTrack alleges and restates paragraphs 1-238 as if set forth fully here.

240.     The Eckart, Folkers, Handke, and Salisbury Agreements (collectively, the "Confidentiality Agreements") are valid and enforceable contracts.

241.     AGI SureTrack has fully performed its contractual obligations to Defendants Eckart, Folkers, Handke, and Salisbury under the Confidentiality Agreements.

242.     Defendants Eckart, Folkers, Handke, and Salisbury failed and/or continue to fail to fully perform their obligations under the Agreements, including the obligation to preserve the secrecy of AGI SureTrack's confidential information, to return, upon termination of employment, all of AGI SureTrack's confidential information in their possession, custody, or control.

243.     The terms of the Confidentiality Agreements are no greater than required for the protection of AGI SureTrack's legitimate business interests, including its confidential and trade

secret information, and the valuable relationships it has with its customers, which were developed at considerable expense, time, and difficulty.

244.    AGI SureTrack has suffered irreparable harm and damages, and will continue to suffer damages though the breach of the Confidentiality Agreements by Defendants Eckart, Folkers, Handke, and Salisbury.

245.    AGI SureTrack's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief. Defendants Eckart, Folkers, Handke, and Salisbury's actions will continue to cause harm to AGI SureTrack if not restrained.

246.    Defendants Eckart, Folkers, Handke and Salisbury, unless restrained, have already and will continue to engage in conduct that breaches the Confidentiality Agreements.

247.    The terms of the Confidentiality Agreements do not pose an undue hardship on defendants Eckart, Folkers, Handke and Salisbury.

248.    The Confidentiality Agreements are not injurious to the public.

249.    Should this Court grant injunctive relief to AGI SureTrack, the burden on defendants Eckart, Folkers, Handke and Salisbury would be slight compared to the current and ongoing injury to AGI SureTrack if relief is not granted. No injury to defendants Eckart, Folkers, Handke and Salisbury would result from an order requiring them to comport their actions under their respective Agreements with AGI SureTrack.

250.    The grant of an injunction will not disserve the public interest.

## COUNT II

### Breach of Contract – Noncompetition Provisions
### (Against Defendants Eckart, Folkers, Handke, and Salisbury)

251.    AGI SureTrack alleges and restates paragraphs 1-238 as if set forth fully here.

252.    The Confidentiality Agreements are valid and enforceable contracts.

253.    AGI SureTrack has fully performed its contractual obligations to defendants Eckart, Folkers, Handke and Salisbury under the Confidentiality Agreements.

254.    Defendants Eckart, Folkers, Handke and Salisbury breached their respective Agreements with AGI SureTrack when they became employed by Aggregate, which consults for or renders services or advice to multiple direct competitors of AGI SureTrack.

255.    Defendants Eckart, Folkers, Handke and Salisbury's duties and responsibilities at their current employer, Aggregate, are the same or substantially similar to and in direct competition with their responsibilities at AGI SureTrack, and they involve the use or disclosure, or the likelihood of the use or disclosure, of AGI SureTrack's confidential and trade secret information.

256.    AGI SureTrack has suffered irreparable harm and has been damaged, and will continue to suffer damages as a result of defendants Eckart, Folkers, Handke and Salisbury's breach of their respective Agreements.

257.    AGI SureTrack's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

258.    Defendants Eckart, Folkers, Handke and Salisbury's actions will continue to cause harm to AGI SureTrack if not restrained.

259.    The terms of their respective Agreements do not pose an undue hardship on defendants Eckart, Folkers, Handke and Salisbury.

46

260.     The Confidentiality Agreements are not injurious to the public.

261.     Should this Court grant injunctive relief to AGI SureTrack, the burden on defendants Eckart, Folkers, and Salisbury would be slight compared to the current and ongoing injury to AGI SureTrack if relief is not granted. No injury to defendants Eckart, Folkers, Handke and Salisbury would result from an order requiring them to comport their actions under their respective IntelliFarms Form Agreement.

262.     The grant of an injunction will not disserve the public interest.

## COUNT III

### Breach of Duty of Good Faith and Fair Dealing
### (Against Defendants Eckart and Folkers)

263.     AGI SureTrack alleges and restates paragraphs 1-238 as if set forth fully here.

264.     Defendants Eckart, Folkers, Handke and Salisbury entered into a valid and enforceable Agreements.

265.     Defendants Eckart, Folkers, Handke and Salisbury owe a duty of good faith and fair dealing, which is inherent in every contract.

266.     Defendants Eckart, Folkers, Handke and Salisbury have breached, and will continue to breach, their respective obligations to act in good faith under their Agreements through their opportunistic actions and exercise of judgment under the contract terms in a manner that has frustrated and will continue to frustrate the purpose of the Agreements such that AGI SureTrack has been deprived the benefit of its bargain with these former employees.

267.     As a result of defendants Eckart, Folkers, Handke and Salisbury's breach of the covenant of good faith and fair dealing, AGI SureTrack has suffered damages, which continue to accrue, in an amount to be proven at trial.

47

**Computer Tampering (RSMo §§ 537.525, 569.095-.099)**
**(Against Defendants Eckart, Folkers, and Walters)**

268.　AGI SureTrack alleges and restates paragraphs 1-238 as if set forth fully here.

269.　Defendants Eckart and Folkers, without authorization or a reasonable grounds to believe he had authorization, violated RSMo. § 569.095(1) when he modified data residing or existing on an AGI SureTrack computer, in the AGI SureTrack computer system, and/or the AGI SureTrack computer network.

270.　Defendants Walters and Eckart, without authorization or reasonable grounds to believe they had authorization, violated RSMo. § 569.095(3) when they disclosed and/or took data residing on an AGI SureTrack computer, in the AGI SureTrack compute system and/or the AGI SureTrack computer network.

271.　Defendants Eckart, Folkers and Walters, without authorization or reasonable grounds to believe they had authorization, violated RSMo. § 569.095(6) when they received and retained data obtained in violation of the statutory section and, upon information and belief, also violated this provision when they used and/or disclosed said data in violation of the statutory section.

272.　As a result of defendants Eckart's, Folkers' and Walters' conduct, AGI SureTrack suffered and will continue to suffer damages, including lost revenue, costs to verify the tampering and losses, recover or attempt to recover destroyed information, and expenses associated with updates to protected computer systems, as well as incur attorneys' fees associated with this action, for which it is entitled to compensation. (RSMo § 537.525).

## COUNT V

### Tortious Interference with a Contract and/or Business Expectancy
### (Against Defendants Eckart, Folkers, Handke, Salisbury, Walters, and Aggregate)

273.    AGI SureTrack alleges and restates paragraphs 1-238 as if set forth fully here.

274.    AGI SureTrack had contracts with identifiable growers. AGI SureTrack had business relationships with identifiable dealers.

275.    AGI SureTrack had valid business expectancies with identifiable grower and dealer business prospects.

276.    Eckart, Folkers, Salisbury, Walters, and Aggregate are, and were, well aware of AGI SureTrack's contracts and business expectancies.

277.    Upon information and belief, Eckart, Folkers, Salisbury, Walters, Aggregate have intentionally interfered with AGI SureTrack's growers and/or dealers by attempting to induce and have actually induced certain growers to terminate or indicate their intent to terminate their relationship with AGI SureTrack.

278.    Upon information and belief, Eckart, Folkers, Salisbury, Walters, Aggregate have intentionally interfered and attempted to divert and actually have diverted away from AGI SureTrack several new, identifiable grower and/or dealer prospects.

279.    Eckart, Folkers, Salisbury, Walters, and Aggregate's interference was unjustified.

280.    Eckart, Folkers, Salisbury, Walters, and Aggregate's interference was through improper means.

281.    Eckart, Folkers, Salisbury, Walters, and Aggregate's interference has damaged and will continue to damage AGI SureTrack.

## COUNT VI

## DEFEND TRADE SECRETS ACT
### (Against Defendants Eckart and Walters)

282.    AGI SureTrack alleges and restates paragraphs 1-238 as if set forth fully here.

283.    AGI SureTrack owns trade secrets, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes used in connection with grain bin technologies, as described in more detail above herein.

284.    AGI SureTrack's trade secrets derived independent economic value from not being generally known to, and not readily ascertainable by proper means by, other persons who could obtain economic value from its disclosure or use.

285.    AGI SureTrack took measures that were reasonable under the circumstances to protect its trade secrets, including, but not limited to, requiring employees to abide by confidentiality requirements and restricting access to data.

286.    Upon information and belief, defendants Eckart and Walters have wrongfully taken and used and will continue to use AGI SureTrack's trade secrets.

287.    By working for Aggregate within the same area that they were responsible for while at AGI SureTrack, defendants Eckart and Walters have placed themselves in a position to wrongfully use, and/or inevitably use, AGI SureTrack's confidential and trade secret information that they learned during their employment with AGI SureTrack.

288.    Defendants Eckart's and Walters' actions in misappropriating AGI SureTrack's trade secrets is and was willful and malicious.

289.    Defendants Eckart's and Walters' misappropriation of AGI SureTrack's trade secrets has and will continue to damage AGI SureTrack.

## COUNT VII

## MISSOURI UNIFORM TRADE SECRETS ACT VIOLATION
### (Against Eckart and Walters)

290.    AGI SureTrack alleges and restates paragraphs 1-238 as if set forth fully here.

291.    AGI SureTrack owns trade secrets, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes used in connection with grain bin technologies, as described in more detail above herein.

292.    AGI SureTrack's trade secrets derived independent economic value from not being generally known to, and not readily ascertainable by proper means by, other persons who could obtain economic value from its disclosure or use.

293.    AGI SureTrack took measures that were reasonable under the circumstances to protect its trade secrets, including, but not limited to, requiring employees to abide by confidentiality requirements and restricting access to data.

294.    Upon information and belief, defendants Eckart and Walters have wrongfully taken and, upon information and belief, have used and will continue to use AGI SureTrack's trade secrets.

295.    By working for Aggregate within the same area that they were responsible for while at AGI SureTrack, defendants Eckart and Walters have placed themselves in a position to wrongfully use, and/or inevitably use, AGI SureTrack's confidential and trade secret information that they learned during their employment with AGI SureTrack.

296.    Defendants Eckart's and Walters' actions in misappropriating AGI SureTrack's trade secrets is and was willful and malicious.

297.    Defendants Eckart's and Walters' misappropriation of AGI SureTrack's trade secrets has and will continue to damage AGI SureTrack.

### REQUEST FOR RELIEF

WHEREFORE, AGI SureTrack demands judgment be entered in its favor and against defendants that:

(1)    awards AGI SureTrack direct damages, indirect damages, and special damages, such as lost profits, in an amount to be proven at trial;

(2)    awards AGI SureTrack its attorneys' fees, costs, and prejudgment interest;

(3)    grants preliminary and permanent injunctive relief that prohibits Defendants from future actual or threatened tortious interference with customers and prospective customers, as well as misappropriation and/or use of AGI SureTrack's confidential and/or trade secret information;

(4)    grants preliminary and permanent injunctive relief to require Defendants to return or destroy, and to not disclose, confidential information they learned through their employment with AGI SureTrack; and

(5)    such other relief as this Court deems just and proper.

Dated: September 6, 2023

Respectfully submitted,


/s/ Joan K. Archer
Joan K. Archer
Missouri Bar No. 44070
CARLTON FIELDS, P.A.
2029 Century Park East, Ste. 1200
Los Angeles, California 90067-2913
Phone: 310-843-6376
Fax: 310-843-6377
jarcher@carltonfields.com

David R. Wright
*Pro Hac Vice Forthcoming*
CARLTON FIELDS, P.A.
4221 W. Boy Scout Blvd., Ste. 1000
Tampa, Florida 33607
Phone: 813-223-7000
dwright@carltonfields.com

*Counsel for Plaintiff*

133936626.1